Case number 19-6258 North American Specialty Insurance Company et al versus Heritage Glass LLC et al. Argument not to exceed 15 minutes per side. Mr. Thorsen, you may proceed for the appellant. Mr. Thorsen. Good morning. Yes, good morning, your honor. Good morning. May it please the court. I'm Chris Thorsen and I represent the appellant Christopher R. Cording in this matter. On this matter, there are four grounds for our appeal following the district court's opinion following a bench trial in this matter. Our first ground is that the district court erred in finding that the assignment of general indemnity agreement did not relate to Appellee Vic Davis's unclean hands conduct giving rise to the claims in this suit. Second, the district court erred in finding that the evidence at trial did not support my client's unclean hands defense. Third, the district court erred by making a finding in its order that Mr. Davis and the board of directors did not breach its fiduciary duty to the company in terminating Mr. Cording when no evidence was put on on that issue in the case. And then fourth, the district court erred in awarding attorney's fees and expenses to Mr. Davis. I'd like to focus my argument today on the first two of those topics that there was no evidence of unclean hands presented at trial and that the finding that the assignment of the general indemnity agreement did not relate to Mr. Davis's unclean hands. This case is to the standard of review in this case is abusive discretion as it relates to the unclean hands doctrine and we submit your honor and the court that the district court erred and abused its discretion by finding that Mr. Davis, Mr. Cording, my client failed to meet his burden of proving unclean hands in defense of the claims brought by Mr. Davis under the assignment and for contribution. Here the entire evidence demonstrates that Mr. Davis engaged in a course of conduct in late December of 2014 and the first half of May of 2015 that constitutes unclean hands giving rise to the very liability that he sought to impose upon Mr. Cording at the district court in this action. Mr. Thorson, this probably counts as a factual question or I'm just trying to understand something. So you have things aren't going well. Mr. Cording is no longer in management. He's still on the indemnity agreement and after he leaves management, I suppose he's still a director, but the indemnification amount has increased from $500,000 to $750,000. Yes. Didn't the indemnity agreement allow your client to get out at that point or at least limit his liability to a part of $550,000 as opposed to what became $750,000? I mean I'm trying to understand why he didn't exercise that authority. Well I think the answer to that your honor and I don't know that there was proof in the record of the answer to that is that after he was forced out of the company, he was no longer allowed back into the company to access the books and records of the company. There was one or two instances where they did show up to the company and were removed by the threat of police. Was he still a um but didn't he didn't he I guess I guess the fact that he wasn't let back in makes it even more obvious he should have called North American and said my exposure is capped here. I don't want it increased anymore. In other words, he didn't have to he didn't have to go to the company. He could have called North America. Well that's probably correct your honor and the the fact of matter is that you know as a director and as a founding member of the company there were a lot of things going on at that time. Particularly as they're ousted Mr. Cording and his brother and the other members of the LLC. It was a great it was a time of great turmoil and not having access to the books and records. I don't know that it occurred to Mr. Cording that that would be a it would be a possibility that Mr. Davis or anybody else would try to increase the amount of the bond. Does the record show whether or not Mr. Cording knew that the amount had been increased from the 550 to the 750? No your honor. The record doesn't show or he doesn't know? I don't think that there was anything in the record at the trial but I don't think he found out about that until after the fact. In other words Mr. Davis never put anybody never put Mr. Cording on notice that that was being done. Mr. Davis increased the amount of that bond at a time when the company had no money had no ability to pay the liability of the power company which at that point was over five hundred thousand dollars. Mr. Davis testified he knew there was no way that the company was able to pay the amount of the electricity bill that was already incurred. From your perspective was it a breach of the indemnity agreement for Davis and others to increase it to 750 without Cording's involvement? I mean did that violate the terms of the contract or what what was I mean I'm not disagreeing it's wrong just tell me why it was wrong. Sure your honor. No I wouldn't argue that it was a breach of the of the indemnity agreement or the guarantee agreement to increase the amount of the bond. What I would say is that it violated Mr. Davis's fiduciary duty to the company and to Mr. Cording by increasing the amount of the bond when he knew there was no way no way that the company was going to be able to pay the electricity bill. It was already incurred much less additional charges that were incurring the very next day after he increased the amount of the bond on May 14th. On May 15th the record shows he sent an email to the corporate attorney Mr. Jim Paris and the title of the email was heritage shutdown and told Mr. Paris in that email that the company was failing and was going to have to shut down so on May the 14th Mr. Davis takes actions to increase my client's liability under the indemnity bond by $225,000 and on the very next day he's he's contemplating a shutdown for the company and then only 12 days later after not paying anything else on the on the electric bill after having received shutoff notices the power company makes good on its promise to shut off the electricity shuts off the electricity and the the glass furnace at the factory is an electric glass furnace and so once the electricity is shut off to that electric glass furnace all of the glass in process freezes up in the furnace and it cost literally millions of dollars to get the old frozen glass out and back in and so those actions all at that time when he knew that there was no way the company was going to pay the bill to increase Mr. Cording's liability. Well help me help me out with this so I'm not targeting your client with mismanagement or it seems fair to observe that the business wasn't going that well. It's not unusual when a business isn't going that well to do some Hail Marys and I guess that's what it looks like in retrospect and I guess I'm not sure I understand why that shows terribly unclean hands either on your client's behalf or Davis's. They're struggling to keep this afloat in retrospect it looks like throwing good money after bad but we're not supposed to judge it that way. Well your honor and I'd like to direct the court's attention to what I think is even the more egregious conduct which which set us down this path to begin with and that was Mr. Davis's conduct in January of 2015. In January of 2015 the company owed $548,000 to the power company. It had received shutoff notices that if if the electric or if the heritage glass did not become current on the electric bill by the end of January they were going to shut off the power. So Mr. Davis testified that he he knew that the company didn't have the money at the time to pay that electric bill and so he sought out a loan from Mr. Bill Thomas who was a member of the LLC and a very prominent insurance agent there in in Knoxville told Mr. Thomas at the at the time that he solicited the loan that the loan proceeds would be used to pay heritage glasses bills primarily the power bill. So Mr. Thomas makes the loan two million dollars came in two installments the first installment of 1.5 million dollars was paid to the company on January the 9th. That same day Mr. Davis takes those loan proceeds and pays himself three hundred and six thousand dollars three hundred and six thousand five hundred. But um is I thought the company authorized that are are you are am I being too technical when I say that but I I. Yes that's a good question your honor. So this is a board managed LLC. There were three board members Mr. Davis Mr. Kearney and Mr. Cording at the time even though he'd been terminated but not removed from the board yet. So Mr. Davis and Mr. Kearney are two-thirds of the board and as two-thirds board members they made the decision to pay themselves first. They paid themselves for for loans that they had made to the company prior but they made the decision to pay How was your client I mean it seems like Thomas would have an objection to this. How was your client hurt? Did is your is the point that um why were they favoring them as opposed to paying off debts of Cording? Is that is that is that the point? Uh yes your honor the. How much did Cording how much was Cording owed at that point? Uh Cording had a loan. In terms of loans. In terms of loans correct seventy-five thousand dollars. And did he ask for that to be paid back? Yes. And what happened? It was a two-thirds. He's never he's never he's never been paid. No but was there a was that. Didn't they pay him something or was that his capital contribution? Can you hear me? Your honor I'm sorry that question was glitched. Can you repeat that? I was under the impression that Cording requested that he receive some of his money back and that he did. Is that wrong? I think that is incorrect your honor. I can get to a basic question. I thought that the this case involves the insurance the the NAS having had to pay off on the bond and Davis seeking contribution for the amount of that Davis paid of six hundred thousand on sorry that NAS had paid. So Davis is seeking contribution from your client and so the whole unclean hands issue seems to me to be pertaining to if NAS had sued. NAS would be entitled to get the money from your client right? That is correct your honor. So why should prior wrongdoing of Davis impact this case? Correct so in the unclean hands context the unclean hands has to be related to the claim that is being brought here and the claim that is being brought here Mr. Davis purchased an assignment of the guarantee from NAS as part of a mediation. So Mr. Davis's theories were he should receive the full amount of the six hundred thousand that he paid under the guarantee and in the alternative that he should be compensated for contribution from from my client and and as it relates to that related to question the district court found that that there that the unclean hands conduct was not related to Mr. Davis's claims against Mr. Cordy. But you know I thought Judge Moore was maybe making this asking the question in this way what does that have to do with anything the point of assignment law is you stand in the shoes not of Davis you stand in the shoes of North American and if no one's saying North American did anything wrong and if Davis buys a clean claim Davis gets to use a clean claim if there's an unclean hands it just hurts Davis with his claims not assigned claims. Well your honor that that might be correct if we're talking about a third party who who received the assignment from NAS but what we're talking about right here is that Mr. Davis's conduct is the conduct that led to this obligation in the first place which was wrongful the company was insolvent Mr. Davis You are stuck we didn't hear what you were saying I said Mr. Thorsen you have been frozen I don't know Judges can you hear anything? I cannot I hear you I can't If IT could step in we cannot hear Mr. Thorsen Your honor I think I have returned I apologize I have Zoom kicked me off and we couldn't get back on so I understand my time is up Yes but but we appreciate your getting on and and it's fine for you to be on the telephone The judge Sutton and I had basically asked you a question which had to do with why any improper activity of Davis before the assignment was relevant and I believe your time is up but we do want you to answer that and then there may be other judge questions so we'll we'll let you just give a quick answer to because the the district court said that it would only consider Davis's conduct related to the indemnity agreement assignment and not to his previous conduct and so I think that takes us to where we left off correct your honor thank you just really quickly the reason that it's relevant is because Davis's unclean hands conduct is a but or cause of the liability that he received via the assignment had Davis not self-dealt at a time when the company was insolvent which is a breach of fiduciary duty and it is likewise a violation of the Tennessee Uniform Fraudulent Transfer Act if he had not done that then the liability under the indemnity agreement and the guarantee would have not been incurred and there would have been nothing for Davis to receive the assignment and Mr. Courting would have no liability under that and it's all but for Mr. Davis's self-dealing okay any any other questions from the judge yeah I've got a couple of questions do I understand and I this is related to one of Sutton's questions you are making no claims that indemnity law or co-guarantor law has been violated and I'm asking because there are rules about when one co-op or guarantor can increase the liability of another but you've made no no argument based on that right no your honor but I still do think that the doctrine of the equitable doctrine of unclean hands would apply I mean the doctrine prohibits a person with unclean hands from coming into the courthouse and what the district court's ruling I understand that you're making the unclean hands argument I just want to clarify for myself that you're not making any claims based on what a co-op legor can do and you're also not making any claims based on uh the operating agreement or any rules about LLCs and how members can withdraw capital your honor and that's that's um we we are our defense is that the that Mr. Davis's self-payment when the company was insolvent violated his fiduciary duty to the company and also violated the Tennessee fraudulent transfer act and those actions that self-dealing that is in violation of those duties that Mr. Davis had is the evidence of self-dealing or is the evidence of unclean hands um that directly led to this um to this liability so okay I have a related question if I could insert is there a state action pending yes there is and are you making those very claims in the state action yes we have asserted breach of fiduciary duty breach of the operating agreement in the state action so so are you saying that we have to decide those very issues that are being litigated as we speak in state court I don't think that's a very the claims in the state court are extremely broad and this this litigation dealt specifically because we have to the unclean hands has to be related to the claim that's being made against Mr. Courting and so under the under the indemnity agreement and the the um the guarantee we had to limit these claims to Mr. Davis's actions with regard to the power bill and uh those agreements and so um his actions with regard to the power bill are pretty clear I mean he he used money that was supposed to go to pay the power bill to pay himself first and and that is the limited um the scope of uh what we tried in this case and we that action is clearly uh demonstrates his unclean hands Mr. Thorson isn't it the case that um you could lose this case the 300,000 is paid to Mr. Davis and you could recover it all in the state action yes that's that yes that that would be what we would what we would do it well why why isn't it wise for us to um it's an assignment uh we we we respect assignment law and then if you need to sort this other stuff out in state court because of fiduciary duties or anything else that's how you sort it out well your honor I think it's important for the court to consider that in this case because what the district court essentially did was it allows a wrongdoer to wash his hands of the wrongdoing simply by settling with the third party to purchase the obligation that was the result of his wrongdoing let me just tell you it's it's perilous the more we get into those issues the more they risk preclusion in the state court well I under your honor I we we understand those risks and and that's one of the reasons why we're here but as it relates to this liability um and Mr. Davis's conduct um we it just it seems extraordinarily inequitable that he's able to self-deal engage in unclean hands incur liability for himself and Mr. Cording and then through settlement purchase a a an assignment of the very claim that was the result of his unclean hands and hold Mr. Cording responsible for that I don't think the equitable doctrine of unclean hands allows for that that's why that equitable doctrine is there um to prevent situations like this from people benefiting from their own unclean hands and that's that's exactly what Mr. Davis has done here and we would ask the court not to open up courts uh to to folks who engage in that kind of conduct any further questions from any judge I do I I'm still trying to get some questions in uh sorry um okay so I think we've established that you're not relying on any of these legal doctrines you're just providing us with facts that you think establish the unclean hands that that's fair that is fair your honor yes okay all right now um it seems to me and I I uh you're you're saying that the standard is a abuse of discretion and and maybe it is in the application of the doctrine but certainly the facts that the judge found um you agree are subject to clearly erroneous right that is correct okay now um do you are you able to tell me how much each of the uh well each of the primary players lost you're not saying that at the end of the day um all Davis lost was the 300,000 that he paid NAS right that's correct okay I mean he lost he had taken loans and given security and lost a lot right yes including his initial investment correct right well I assume everybody lost their initial investment right that is correct okay so why was it I mean unclean hands is an equitable doctrine why was it wrong for this judge to look at all the facts look at what Davis was doing in terms of using his own personal property to provide collateral for money to run the business and conclude that there was no breach here and nor was there unclean hands because everything he was doing was for the business even taking some of the two million dollars to pay himself back for some interim loans so that he could keep everything going like what was wrong with that analysis your honor that's a very good question thank you um and what we're talking about here is really the business judgment rule and the business judgment rule provides that there's a presumption that in making business decisions for the direct the directors of the corporation acted in an informed basis in good faith and in the honest belief that the action taken was in the best interest of the company and that's where we that's where we come to here with regard to Mr. Davis's self-dealing and paying himself 306,000 and his friend 147,000 or something like that there is he made no showing no attempt to show how those self-payments when the company was underwater and the power company was threatening to show off the power how those self-payments was in the best interest of the company and that's the fact that you can't reconcile okay and then um can you tell me how much of his own money he had put in at that point not counting his capital contribution just loans to the company to keep it going uh your honor prior to January the 9th uh Mr. Davis had loaned less than $306,000 to the company um we have here it is uh yes um so through January the 7th Mr. Davis um had loaned the company and I have to do a quick bit of math here 406,500 minus 125 uh he had loaned the company 281,500 I believe and then on the very same day that they received the loan proceeds from Mr. Thomas Mr. Davis makes a second another loan of $125,000 on that day and from the loan proceeds that he received from Mr. Thomas on that exact same day he paid himself back $25,000 of that loan that he made on that very same day that he didn't have an explanation as to why why he made a quote-unquote loan on that day and used the Thomas proceeds to pay himself back for the loan he made on that very same day so um so so as of January the 9th um if you include the $125,000 loan that he that Davis made on that day he had uh loaned the company $406,500 and then through the Thomas loan proceeds paid himself back $306,500 of those of that money okay and then um so in the beginning he made his capital contribution was what half a million yes I believe that's right that's correct and then I think pretty early on he he put in some more money um I don't not that I'm aware of um sitting here today other than those loans I just discussed okay so so what I'm asking is after that first $500,000 everything he put in was treated as a loan yes and I I think you said earlier that your client never got anything back well uh he never got his investment back he did not get his $75,000 loan back um I think that they he and the others who are operating the business may have gotten paid by way of a salary um but uh then began deferring their salary and um so those additional payments for deferred salary were never paid either okay and then this is this is my last question at this point um uh it's unclear to me I thought I thought you were finding fault with uh with the court for making certain findings and I guess those just relate to firing cordon or according I mean are you does does the getting rid of courting have anything to do with the unclean hands argument or or anything else no your honor and and we stated we expressly stated that at the beginning of the trial and then throughout the trial that um that was not part of our defense in this action um we were not going to present any proof on that issue um anytime it came up there was an objection raised that it was not relevant uh to the issue the court essentially um took those really presented um no proof as to the reasons behind it uh the um the propriety of that decision or the effect of that on the company that that just was not part of the trial okay thank you you're welcome your honor thank you thank you okay uh mr desauer good morning your honor um my name is mark desauer i'm a member of the tennessee bar and i'm from kingsport tennessee i represent daniel victor davis who was the appellee in this case and was a third party plaintiff below our position on appeal is that the district court's decisions were correct in all respects and should be affirmed on appeal um i wanted to answer a few questions that i thought were left open-ended and actually uh judge white asked the question whether courting was paid any money uh in the beginning and the answer to that question is yes uh he had some seed money that he invested uh expenses that were incurred in the formation of the company and it was approximately a hundred and seventy thousand dollars and when the company was formed and they had their initial um loan to get the business started he was reimbursed those funds and also during the entire time or vast majority of the time that he was this chief executive officer of the company he was paid a salary by the company and it was not until he was terminated that he was no longer drawing any income from the company in addition the operating agreement that the party signed the proof of trial showed that that was a document that was negotiated uh primarily by mr courting uh and under the terms of the operating agreement all the management of the business was given to the three member board of directors which consisted of mr davis mr courting and mr kearney and the operating agreement clearly provides that the majority of the uh board has the authority to not only own and operate the business but discharge any employee if they found it necessary now mr courting's termination was an issue at trial and mr courting has been all over the map on this issue but there was testimony at trial as to why he was terminated and the testimony was that mr courting and mr kearney were the ones that were actually managing the business mr davis was an outside investor who had decided to invest in the business because of you know this is a plant here in kingsport that's been here almost 100 maybe 80 years and it would shut down recently and this was an opportunity to bring it uh back to work uh and mr davis thought that was something he he was interested in and should invest in and he did invest 500 000 in the business but um he he did not get actively involved in the business until mr courting was terminated he was an outside investor but he they couldn't manage the business uh council i have a just a technical question i maybe i it shows a lack of understanding um mr davis was awarded 300 000 through the assignment yes sir is that what was requested well the amount of the bond the amount of the liability the amount that nas played to the power company was 750 000 mr davis settled his claim with nas by paying 600 000 in consideration of that he received the assignment of the claim against mr courty so the contribution was three what judge greer found was that the contribution would be 300 000 which was half of the liability the other co-indemnitors under the bond under the and mr kearney who had filed for bankruptcy and received the discharge so he he was the court found incorrectly under the law that that you can't recover in contribution from an insolvent guarantor or indemnitore in this case see in any in any event go ahead um what did do you agree with opposing council's numbers i mean after that loan i understand your position is that uh there was no condition uh regarding that loan that it all be paid to um to the the power company um but do you agree with the numbers that your client had loaned less than 300 000 to the company when he was paid back a little over 300 000 um no your honor um on january 9th of 2015 mr davis had loaned the company a total of 406 500 he was not paid the 306 at the time he was paid the 306 500 he was paid some money back the day that he was made loan money to the company the day he was paid some money back and and you know the facts the proof of trial on that issue was really unclear as to whether all that occurred simultaneously or not but that's what the document shows uh but no and i'll also say this your honor that subsequent to that and the proof showed it when the business closed mr davis was owed 780 000 um that was independent of his 500 000 investment in addition your honor he when the two million dollar loan came into the company mr davis was required to personally guarantee that loan and he and he not only was he required to personally guarantee that that loan he was required to pledge personal assets that he owned to secure his guarantee and those funds were used uh for the company and the money that he was paid back was money that his he owns a construction company that his construction company had loaned heritage class well are you in i'm sorry uh we don't say in his pocket it's i'm sorry what none of that money went into his pocket and but hold on hold on you say that the construction company loaned it to heritage so you're you're saying that's not part of the 406 000 davis owned are you saying that davis took money out of his company to make those loans of 406 000 uh mr desauer seems frozen mr desauer are you there now uh yes ma'am uh i apologize i'm not sure what happened no no problem we understand obviously it happens to everybody um would you uh like to answer judge white's question or do you want her to re-ask uh no ma'am i think i remember it um what i was trying to explain was that the money that was repaid to mr davis the 366 000 that was money that he had originally taken out of his independent company uh to put into heritage glass he took that money out and a loan to himself and then and put it in heritage glass and when it was repaid he put it back in his company that was the test his testimony at trial right but that was included so at the at the end of the day on the 9th how how much was he owing how much was he owed a hundred thousand dollars okay um and as i mentioned before at the end of the in may of 2015 he was owed 780 000 which represented the additional funds that he had put into the company i'm going to step up i'm gonna close my door there's other folks in my office that are moving around so um um and that's and he lost that right and as i mentioned uh he's still paying back the two million dollars um that he that the company borrowed from mr thomas and again the proof was that there were no conditions placed on those loan proceeds uh that it was going to be used to really you know judge sutton said it well i mean they were throwing hail marys they were trying to save the business and they were doing everything that they were that was they could do to try to save the business and that's when mr davis came in and started running the business because at least his decision was that um he had to break the log jam between mr courting and mr and he elected to break the log jam by terminating mr courting because the the company was they were not doing well and and that was the decision he made and uh and he was authorized by the operating agreement to make that decision so in terms of um uh um well i guess you answered that okay um in terms of the attorney fees um if i understand correctly judge grier said okay i mean this is a valid a valid claim um but there's also the doctrine that uh you can't benefit from getting an assignment and you're really only entitled to to half because of you know you're entitled to the contribution you're not entitled to pay 600 and get the claim and then get the get 600 so in effect didn't you really just get the contribution um i think that's one way to look at it but i don't think that was the reasoning that was employed by judge grier uh judge grier reasoned that the assignment was for the full claim but that he was not going to enforce the full claim but adjusted it in an equitable fashion ultimate the ultimate result was it was the contribution number but that's not what that's not how he viewed it he he thought he was adjusting it in a way and and frankly applying equitable principles to adjust it in a way such that it was not a windfall if you will mr davis paid 600 000 and he got half of it back from mr courting who was the other solvent guarantor and judge grier went on to find well that has nothing really to do with his right for attorney's fees because he took an assignment of the indemnity agreement which clearly provides for an award of attorney's fees and does it council i'm sorry does the indemnity agreement provide for an award of attorney fees to anyone who um who pursues a claim under it does it provide for attorney fees between guarantors in the event that one guarantor has to enforce the liability of another guarantor i don't think it addresses that at all your honor um okay what it does provide is the indemnity has a claim for attorney's fees and that right was assigned to mr davis uh and under assignment law he has all the rights of the astonisher and steps into the aston or shoes for the rights to collect those attorneys and that's where judge grier came down on it and i think that's correct your honor getting back to a question that was asked of your opponent the uh bond was increased from 500 000 to 750 was that when uh mr cording was still involved as um in his role as as head of the company or alternatively did mr cording have any knowledge of that increase in any right to object this when the bond was increased from 525 to 750 mr cording was no longer actively involved in the business um he did have the right as judge sutton noted to when he was terminated to go to the bonding company or the insurance company and tell them under the agreement that he any increases in his liability um he could restrict it's just like any guarantor that signs a guarantee uh if the principal obligor if you're no longer involved with the company you have the right to go to the lender and tell them i'm no longer involved with the company and i'm not no longer responsible for any increase in the evidence that's what the indemnity agreement provided and mr cording had that right are you frozen again mr desauer if you want to make the last two minutes of remarks that you'd like to make that would be great um i'm just going to make a brief remark i may not take my entire two minutes but just to say it's my belief that the standard review of all the claims in this case or abuse of discretion and under no circumstances do i agree that mr cording has met his burden to establish that the district judge abused his discretion in this case and for those reasons we ask that the decision be affirmed thank you and i apologize for all the glitches no problem we we do understand technology having its uh moments and so it is no problem at all uh mr thorson you have your three minutes thank you your honor um just uh very quickly here in my three minutes um mr dower mr desauer is correct that uh mr cording was initially paid back that seed money essentially at an inception of the um at the inception of the company once they received proceeds uh from its lender um and that was really before uh the company took a turn for the worse in terms of um no revenue coming in and expenses continuing to pile up and burning through the um when when your honor asked me about that previously with regard to uh mr uh cording's termination um we direct uh the court to um my opening statement uh in in the case and let's see well in my opening statement to the case i made clear to the court that um the issues surrounding mr cording's termination were not relevant to the case there were several objections throughout the um throughout the proceeding that were that were uh essentially taken under advisement but towards the end of the proceeding um there was a witness called mr ed phillips and he began testifying about how he was brought in around the time of the termination um and he was asked questions about what he saw when he got there and we objected to those questions and the court and the objection to the question was uh your honor those again both same objection relevance has nothing to do with the issues at trial here and the court says the relevance is not obvious what is the relevance and mr desire said well there's always been an issue that the reason for mr cording's termination led to the financial failure and he goes on and the court says well how is that an issue in this case mr desire says i'm not sure that it is judge but it's been i really have a hard time identifying what the issues are so they say 2014 then they jump to 2015 and now they say that what happened in 2015 doesn't matter so that's why he's here and the court says i honestly don't see the relevance of it mr desire that's sustained um and so for the court to then sustain the objection that that evidence regarding mr cording's firing is not relevant to the case where we've already said that it is not relevant and we don't intend to put on any proof and then to make a finding in its final memorandum opinion um that that mr davis did not breach his fiduciary duty by firing uh mr courting that that is error and and the reason that that is important is because the issues surrounding mr courting and the other uh members firing is the exact issue that's before the court in the in the sullivan county chancery court um with regard to um council are you saying okay so the saying that it wasn't a breach of the fiduciary duty is that the same as saying that well i'm not sure exactly what your claim is in the state court is your your claim regarding his firing is that a breach of fiduciary duty claim yes your honor and that's the issue in the state court action i see okay okay so so our deputy has held up the red card indicating that the rebuttal time is over so if any judge has a further question of mr thorson that's fine otherwise i think we're concluded any further questions not seeing any uh and not hearing any um so mr dusour and mr thorson we thank you for your argument the case will be submitted and you may disconnect from the uh proceeding thank you thank you very much